PATRICK R. BANNON

*v.*

THE STATE OF ILLINOIS.

*Opinion filed January 24, 1895.*

WATERS—*particular facts under which claimant is entitled to recover for damages to land caused by overflow of canal.* Court reviews evidence and finds claimant entitled to damages for injury to lands caused by overflow of Illinois & Michigan and Des Plaines river, resulting from repairing and raising dam.

The claimant is the owner of about twenty-five acres of land situated just north of the north limits of the city of Joliet, and west of the Des Plaines river. A short distance south of the south line of claimant's land the river enters what is called the upper basin of the Illinois and Michigan canal, under what is known as the Tow-path bridge. This upper basin is a widening of the canal proper, and was constructed many years ago by the State of Illinois, and into it the river was diverted from its natural channel, entering it near its north end. This basin is about three-quarters of a mile in length, from the place where the channel widens, to the dam known as the Jackson street dam, over which the water flows into what is known as the lower basin. The tow-path is on the west side of the basin. The dam is about two hundred and sixty feet long, and between its west end and the west wall of the basin there is a lock. The entire volume of water from the river and the canal, passes through this basin and over this dam. Just west of the river and east of claimant's land is a right of way of the Chicago and Santa Fe Railroad Company, upon which, however, the railroad is not yet constructed. The water in the basin is nearly level, there being but little fall from north to south—some witnesses estimating the fall at three and three-quarters inches from the Tow-path bridge to the dam, and others placing it at a much smaller figure.

The claim herein is based upon the alleged raising of the Jackson street dam, whereby it is claimed that the water in the basin and in the river is considerably raised, and that in consequence the claimant's land has been overflowed, and is subject to overflow, to a greater extent than it would be, but for the raising of the dam; and that his land is thereby greatly damaged. It appears that the Jackson street dam is a solid cut stone structure, built by the State, upwards of forty years ago; that during the high water in February, 1893, about two thirds of the coping stone of the dam was washed away, leaving intact only about fifty-five feet of the west side, and about forty feet on the east side of the dam. To repair this break the State canal authorities caused a large amount of rip rap to be placed just back of the dam, and next to the break. This riprap consisted mostly of loose stones, which were hauled in, and dumped back of and upon the dam. So much of this material was hauled in, that it was piled up considerably higher than the height of the dam before the break. Much of the water passes through the rip rap but from the evidence before us, the conclusion is irresistible that the rip rap causes the water to rise considerably higher than it would have done, had the dam been restored to the condition in which it was before the break. Some of the witnesses differ widely as to the extent of this rise thus caused; but we think it reasonable to conclude from the evidence that it is about ten inches at the dam. It then becomes material to know what, if any, effect such rise in the water at the dam would have upon the river near claimant's property. Upon this question the evidence is quite conflicting, varying from one foot to nothing, in the opinions of the different witnesses. The actual effect seems to be impossible of exact ascertainment, especially under the evidence before us. It is quite apparent that there is very little fall from the north end of the basin to the dam. The opening under the Tow-path bridge does not seem to be sufficient for the free passage of the

water of the river into the basin. This sets back some-
what the water in the river, causing it to be some higher
that the water in the basin. Whether a rise of a few
inches of the water in the basin would cause an equal
rise for a considerable distance in the river, is a ques-
tion which, under the evidence is not free from doubt;
but we think it reasonable to assume that it would have
some effect on the water in the river, but not equal
to the effect observed in the basin; and we think it
equally reasonable to assume under the evidence, that
a rise of ten inches at the dam, would have a marked
effect upon the height of the water in the basin at the
Tow-path bridge, but not so much as at the dam, for all,
or the greater part, of the fall between the two points,
must be deducted from the rise at the dam, to arrive at
the effect at the Tow-path bridge. So, under all the
evidence before us, we are led to the conclusion that
the maximum effect of the rip rap placed upon the dam
would be to cause a rise of about six and one-half inches
in the river, at the south end of claimant's property.
This effect would gradually lessen further north, be-
cause the flow of the river being toward the south, it is
somewhat higher toward the north; and as claimant's
property is about one quarter of a mile in length from
north to south, this effect would be gradually lessened
toward his north line.

Whether or not the increased height of the dam is
permanent, is a matter of some importance, for if only
temporary, the claimant cannot be said to have sustain-
ed any substantial damage; for the increased overflow
which his land may have suffered, has not been shown to
have, as yet, substantially diverted the property from
any use to which it might reasonably have been put, in-
cluding even its sale for building lots.

The reason given for raising the dam, is to deepen the
water, in order to prevent boats from dragging in the
mud at the bottom of the basin. It appears that the
State has been at work dredging out the basin, yet it

does not appear that the dam will be again lowered when the basin is sufficiently dredged, if, indeed, there is any intention on the part of the State to further dredge the basin. And it does not appear that there is any provision made, or attempted to be made, or possible to be made, for the carrying off, in times of high water, the additional water that would otherwise be set back because of the additional height of the dam. It appears from the evidence that the canal authorities were notified by the claimant that his land would be damaged unless the dam was lowered to its former height; that the rip rap was thereupon somewhat leveled off by the canal authorities, but was not materially lowered. Whatever, if any, effect upon the conclusion reached by the Commission, a subsequent lowering of the dam may or ought to have, is not for us to determine; but for the purpose of the case we must, in justice to the claimant assume the permanence of the condition thus caused by the State, and by it permitted to remain for a period of nearly three years, against the protest of the claimant.

Under these circumstances it is apparent that through this action on the part of the State in raising the dam, part of the claimant's land has sustained damaged, and the only question is, how much.

Several witnesses have testified to a damage of five or six thousand dollars to the reputation of the property by reason of overflow. As regards this element, even though allowable in a proper case, yet it appears that the land in question most subject to overflow, was occasionally overflowed prior to the raising of the dam, and that raising the dam only increased the frequency, and the amount of the overflow. If occasional overflow damaged the reputation of this land, then such damage was done before the dam was raised. All claim for damage to reputation is therefore disallowed.

The question of the proper measure of damage in this case is not free from difficulty. There is no evidence to show with reasonable certainty, the market value of the

land before and after the raising of the dam. About twenty acres of the land was purchased by the claimant five or six years ago, at a price aggregating about five thousand dollars. This land, with other that he had, he subdivided into lots, and called it Edgewater Addition. Portion of the land was very low, and this he filled some, obtaining his material from a quarry which constitutes part of his addition. It would not be fair to compute the damages at the difference between the market value of the land before and since the dam was raised, as just about that time other conditions intervened which materially affected market values, and especially property held for speculative purposes, as this was and is. The stringency of the times, has been such that not one of the lots in question has been sold. There is no evidence of what similarly situated lots in the vicinity have brought, if indeed, there have been any sales of such in the last few years.

The staking out of vacant property, and running of imaginary lines by platting the same into lots, does not, materially enhance its value, although with many persons the mere mention of that uncertain and indefinite quantity "lot," at once induces belief in a largely increased valuation which would not otherwise exist.

Edgewater Addition presents a varied surface. The extreme westerly part is high, being ten or fifteen feet above the property immediately east, and forming a sort of bluff. The northerly half of the property is quite high, most of it being above the highest water mark, but containing some ravines and depressions. The south easterly portion is the part which is the lowest, and which has already been partly filled, and which it is necessary to fill still more, without taking into consideration the raising of the dam. A considerable portion of the property has been operated by the claimant as a stone quarry. This part is situated next east of the bluff, and much of the abruptness of the bluff is caused by the excavation of the quarry. Witnesses have testified that the property is especially valuable for residence

purposes, for workingmen's homes, and some to its value for manufacturing purposes. It seems apparent that, within reasonable limits, the higher above the level of the river, the more valuable is the land for either of these purposes. Property which is five or six feet above the level of the water is better adapted for residence and manufacturing, than if it was just even with the water's edge. If the claimant in working his quarries had designed to leave the property so it would be best suited for residence or manufacturing purposes, it would have been better if he had left it several feet higher than he did, so that it would not have been subject to overflow in any event. We think it hardly just, that as to this part of the property, he could cut it down to just about on a level with the surface of the water, and thereby decrease its value for occupation for residence or manufacturing purposes, and then complain because the river is raised a few inches. As to the ravines and depressions in the more northerly portion of the land it seems that to put this part of the property to its best use, they would have to be filled to a height to correspond to the land in the immediate vicinity. This land is high and dry, and is in no manner affected by the increased height of the dam, and as the depressions and ravines therein, would, in any event, have to be filled as suggested, no damage can be allowed on account thereof, and none for that part of the land which was used for quarry purposes.

It seems clear to us that something should be allowed for damage to the southeasterly part of the land; and we are inclined to the belief that such damaged should be measured by the reasonable cost of filling the same about six and one-half inches. Various estimates of the cost of such filling have been made. It appears that the filling already done was from plaintiff's quarry, and that the cost thereof was about twenty-five cents a yard. It is claimed that it is now difficult to obtain material for filling, and the same must be hauled by wagon for a long distance, and that it would therefore cost from

seventy-five to ninety cents a yard. Perhaps it would cost as much as this if it were hauled by wagon, and even more if it were hauled by less convenient means of transportation; but we believe that in the future, when, by increased demand for property the necessity for improving this property may exist, if the claimant will avail himself of those facilities which modern appliances for excavation and transportation afford, he can have the necessary filling done at a much less cost than as above suggested. The rigth of way of the Santa Fe railroad adjoins his property on the east; and by the time it becomes necessary to do this filling, the tracks of this road will in all probability have been laid. The Elgin, Joliet and Eastern road is not far north of this property, and has a switch track running to the manufacturies which have been testified to as being just north of claimant's property; and in case of the use of this property for manufacturing purposes, which, indeed, seems to be the use to which the property is best adapted, this switch would doubtless be extended to this property; or it might be temporarily and cheaply extended thereto for the very purpose of the filling. In any case, the property would be in close proximity to a railroad, by means of which the filling could undoubtedly be hauled upon this property at a much less cost than estimated by any of the witnesses, who testified to the price for loading it by men and hauling it by teams. It is quite impossible to determine exactly, either the amount of the filling which the raising of the dam necessitates, or the cost thereof. As in most questions of damages, a fair approximation is the best solution that can be hoped for. Under all the circumstances of the case, the Commission is of the opinion that the claimant ought to have and receive from the State of Illinois for all damages by reason of his aforesaid claim, the sum of twenty-one hundred dollars, together with one hundred and fifty-eight and 85-100 ($158.85) dollars costs, which amount is hereby awarded to the claimant, and against the State of Illinois.